UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MULTILAYER WORLDWIDE ENTERPRISES,
LLC,

                    Plaintiff,

    -against-

DANIEL KUSH,

                   Defendant.

------------------------------------------------------------X

**COMPLAINT**

Case No.

**JUDGE KARAS**

08 CV. 1939

Multilayer Worldwide Enterprises, LLC, by its attorneys, Kurzman Eisenberg Corbin &

Lever, LLP, as and for its complaint, alleges as follows:

## JURISDICTION AND VENUE

1.     This court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1332 based upon diversity of citizenship and because the damages sustained by Plaintiff

exceed $75,000.

2.     Venue is proper in this judicial district pursuant to the forum selection clause

contained in Section 13(e) of the parties' Employment Agreement, which designates New York

as the only proper forum for any action initiated in connection with the Agreement.  A copy of

the Employment Agreement, dated December 14, 2005, for the period commencing January 1,

2005 through December 31, 2009 (the "Term") is annexed hereto as Exhibit A.

## THE PARTIES

3.     Plaintiff, Multilayer Worldwide Enterprises, LLC, ("MWE" or the "Company") is

a limited liability company formed under the laws of the State of Florida.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

4.    The only members of MWE are its managing member, Martin Wilheim ("Wilheim"), the Emily P. Wilheim Irrevocable Trust and the Andrea W. Falco Irrevocable Trust (collectively, the "Trusts").

5.    Wilheim is domiciled in and is a citizen of the State of Florida.

6.    The Trustee of the Trusts, David M. Kies, is domiciled in and is a citizen of the State of New York.

7.    The Defendant, Daniel Kush ("Kush") is domiciled in and is a citizen of the State of Georgia.

## FACTUAL BACKGROUND

8.    MWE is engaged in the distribution and sale of products in the printed circuit board ("PCB") industry.  The products sold by MWE are supplied exclusively by Metalized Products, Inc., a Massachusetts corporation doing business as MPI Technologies ("MPI"), an affiliate of MWE, and include its Pacothane products.

9.    Kush, a long-time employee of the Company for more than fifteen years, served as the Company's Director of Sales and Marketing for approximately four years preceding his termination on January 28, 2008.

10.    As the Company's Director of Sales and Marketing, Kush had exclusive responsibility for the oversight of sales of more than $5 million of the Company's Pacothane products, domestically and internationally, and for the marketing of such products.  The Pacothane products are comprised of a unique blend of proprietary release paper and related products for the PCB industry (hereinafter, the "Pacothane Products").

11.    Among his duties as the Director of Sales and Marketing for the Company, Kush was responsible for the coordination and oversight of the sales of its Pacothane Products with

Insulectro, the Company's exclusive distributor in the United States, the coordination and oversight of the Company's sales of Pacothane Products in Asia and Europe, and for maintaining and overseeing the Company's relationships with its customers in North America, Europe and Asia. All of the Company's sales and marketing personnel reported to Kush.

12.     Pursuant to the Employment Agreement, Kush agreed to devote his full time and attention to the business of MWE and to use his best efforts to promote the interests and welfare of the Company. (Ex. A at §2(3)).

13.     The Employment Agreement further provided that, for each calendar year of the Term, Kush would receive a base salary of $150,000, with a five percent increase each year, and an annual non-discretionary bonus based upon a formula using the aggregate gross margin for the sales of Pacothane Products, as shown on the Company's financial statements. (Ex. A at §§3, 4). The Employment Agreement also provided for a number of fringe benefits, including a car allowance, vacation and sick leave and group insurance, and for the reimbursement of the reasonably necessary travel and entertainment expenses incurred by Kush for the benefit of the Company. (Ex. A at §§5, 6).

14.     In accordance with the terms of the Employment Agreement, Kush was paid annual salaries of $157,500 for 2006, $165,375 for 2007 and a non-discretionary bonus of $75,000 for 2006.

15.     Additionally, Kush received other valuable fringe benefits, including, a car allowance, group health, life and disability insurance and a 401(k) plan, with a collective approximate value of at least $40,000 per year.

16.     Kush also was reimbursed for substantial travel and entertainment expenses (hereinafter, "Business Expenses"), based upon the expense reports that he submitted to the

Company.

17.    In light of Kush's access to confidential information regarding the manufacture and sale of Pacothane Products, the Employment Agreement contained a Restrictive Covenant which required that Kush keep confidential and protect all of the Company's "Confidential Information". Confidential Information was defined by the Agreement to include "data, proprietary information, financial information, trade secrets, and other materials and information, including... contracts, customer lists, supplier lists, information regarding specific customer needs, purchasing history, pricing information, information related to costs, marketing, selling, servicing, technology, knowhow, plans, processes, techniques... concerning the operation of the Company's business", which was not publicly available (hereinafter, "Confidential Information"). Ex. A at §§8 (a), (b)(i).

18.    Kush agreed to refrain from disclosing such Confidential Information to any person or entity, except in the performance of his duties for the Company, and from using any Confidential Information, except for the exclusive benefit of the Company. Ex. A at §§8 (b)(ii)(iii).

19.    Kush further agreed to return any Confidential Information and any documents containing Confidential Information at the end of his Employment Term or upon the Company's request. Ex. A at §8(b)(iv).

20.    The Restrictive Covenant also provided, in pertinent part, that for a period commencing upon the date of the Employment Agreement and ending two years following the effective date of termination (the "Covenant Period"), Kush shall not:

> directly or indirectly (whether as owner, principal, agent, partner,
> officer, employee, independent contractor, consultant, stockholder
> or otherwise), engage or participate or have any financial interest in

> or perform services for, any entity which offers any service in competition with the Company or engage in any business or activity which is substantially the same as any business or activity related to the business which the Company or any of its affiliates is now or may hereafter become engaged in any location where such activity would be in competition with the business of the Company at the time of the termination of Executive's employment with the Company.

Ex. A at §8(c)(i).

21.     Pursuant to the Restrictive Covenant, Kush was also prohibited from directly or indirectly, soliciting, diverting, interfering with or disrupting the Company's business relationship with any client, customer or business contact of the Company or with any potential client, customer or business contact of the Company during the Covenant Period, or from attempting to do so. Ex. A at §8(c)(ii).

22.     The Restrictive Covenant further prohibited Kush from directly or indirectly, diverting, attempting to divert, soliciting, recruiting, or hiring any employee of the Company during the Covenant Period, unless such person had ceased to be an employee of the Company for period of at least twelve months. Ex. A at §8(c)(iii).

23.     Kush was further required to promptly deliver to the Company all documents relating to the Company's business upon termination or otherwise upon the Company's request. Ex. A at §8(f).

24.     The Employment Agreement provided that Kush could be terminated by the Company either with or without cause. Ex. A at §§7(a), 7(b).  Among the grounds authorizing termination for cause were: the commission of an intentional act of fraud against the Company; conduct which had a material adverse effect upon the performance of his duties or upon the relationship of customers or employees of the Company with the Company; and gross negligence or willful misconduct in the performance of his duties which had a material adverse effect on the

Company's profits, operations or business. Ex. A at § 7(a)(iii)(iv)(v).

25.    In or about January, 2008, the Company learned that during the period January 2007 through November 2007, Kush had submitted several false expense reports for which he was reimbursed by the Company. At that time, the aggregate amount of the false expenses for which Kush was reimbursed was believed to be approximately $9,000.

26.    As a result of Kush's falsification of expense reports, the Company terminated Kush for cause on or about January 28, 2008.

27.    A subsequent examination of Kush's Company computer upon his termination revealed that, in direct contravention of the direction of the Company to maintain all computer files intact, upon information and belief, Kush had deleted substantial portions of the e-mails and other documents from the hard drive for the period from, at least mid-2004 through January 2008.

28.    The Company's subsequent retrieval of a portion of the e-mails and other documents deleted from Kush's computer (the " Retrieved Documents") revealed that for the period from in or about mid-2006 through his termination, Kush had secretly used the Company's time, facilities and confidential and proprietary information in an effort to start a competitive business, to be known as Global Films Knock Down LLC ("Global Films") primarily sourced from Asia, the formation of which was concealed from the Company.

29.    The Retrieved Documents further revealed that, during the period from at least mid-2006 through January 2008 and using the Company's Confidential Information:

(a)    Kush prepared a business plan for Global Films, which was to be based in Smyrna, Georgia, where Kush is and was domiciled. Among other things, the business plan contained cost projections through 2009 and revenue projections through 2012, and revealed that

Global Films was intending to manufacture and sell products substantially identical to the Pacothane Products, supplied by the Company's affiliate, MPI, and sold by the Company. Furthermore, Global Films was arranging for the sale of those products to the Company's existing customers and to potential customers diverted from the Company's target markets.

(b)    Kush enlisted co-venturers for the start-up and management of Global Films including the Company's Chinese distributor, Grandmake, along with another MWE employee, David Griesel, to distribute Global Films' products in Asia;

(c)    Kush and his co-venturers priced and negotiated the acquisition of the necessary equipment, including an extruder, required for the manufacture of the competitive products, found a location for the business and conducted preliminary testing, all with the intention of commencing operation of Global Films by mid-2008;

(d)    Kush attempted to hire several Company employees to assist him in the start-up of the competitive business. Kush succeeded in enlisting Company employee, David Griesel, to assist in his efforts to form Global Films and to serve as one of its co-owners, further diverting the resources of the Company.

(e)    Kush improperly charged the Company for his time and services during this period, in which he devoted a substantial portion of his working time to the start-up of Global Films;

(f)    Kush improperly charged the Company for expenses for the startup of Global Films by falsely characterizing them as legitimate business expenses for the Company;

(g)    Kush solicited Insulectro, the Company's exclusive North American distributor, to hire him to compete against the Company; and

(h)    Kush improperly charged the Company for expenses for personal pursuits

unrelated to the Company's business, by falsely characterizing them as legitimate Business Expenses.

## COUNT ONE

### (Breach of Contract: Violation of the Confidentiality Clause of the Restrictive Covenant)

30.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "29", as if fully set forth herein.

31.     By virtue of his unique position as the Company's key sales manager, Kush was privy to the Confidential Information of the Company regarding its Pacothane Products, including the specifications for and the method of manufacturing of such products, the source of suppliers for raw materials, the costs of manufacturing and sales, the names of customers and distributors, proprietary information regarding customer contracts, the Company's commission structure and performance data, the advantages and disadvantages of Pacothane Products versus competitive products, and corporate planning details, including the Company's 2008-2009 business plan, which was not publicly available.

32.     Pursuant to the terms of the Employment Agreement, Kush was required to keep confidential and to protect all Confidential Information, as defined therein, to refrain from disclosing any such Confidential Information to any person or entity except in the performance of his duties for the Company, and from using any Confidential Information, except for the exclusive benefit of the Company.

33.     Pursuant to the terms of the Employment Agreement, Kush was further required to return to the Company any Confidential Information and any documents containing Confidential Information at the end of the Term or upon the Company's request.

34.    Nevertheless, in willful and deliberate breach of the Employment Agreement, during the period of his employment by the Company, Kush repeatedly disclosed Confidential Information to third parties, including his co-venturers in the start-up of Global Films, and used such Confidential Information in violation of his obligation to use such information solely for the exclusive benefit of the Company.

35.    In further violation of the Employment Agreement, Kush failed to return Confidential Information upon the Company's request, and willfully and intentionally destroyed and/or attempted to destroy such information in response to the Company's request for its return.

36.    Kush's breach of the Confidentiality clause of the Restrictive Covenant has resulted in direct and consequential damages to Plaintiff, including loss of profits and damage to the Company's good will, in an amount to be proven at trial.

### COUNT TWO

**(Breach of Contract : Violation of the Non-Competition Clause
of the Restrictive Covenant)**

37.    Plaintiff repeats the allegations set forth in paragraphs "1" through "36", as if fully set forth herein.

38.    Pursuant to the terms of the Employment Agreement, during the Covenant Period, Kush was required, among other things, to refrain from directly or indirectly: (1) participating or having any financial interest in or performing services for any entity which offered any service in competition with the Company or from engaging in any business or activity which was substantially the same as any business or activity related to the business of the Company;  (2) soliciting, diverting, interfering with or disrupting the Company's business relationship with any client, customer or business contact of the Company or with any potential client, customer or

business contact of the Company, or from attempting to do so, and; (c) diverting, attempting to divert, soliciting, recruiting, or hiring any employee of the Company during the Covenant Period, unless such person had ceased to be an employee of the Company for period of at least twelve months.

39.    Kush was further required to promptly deliver to the Company all documents relating to the Company's business upon termination or otherwise upon the Company's request.

40.    Nevertheless, in willful and deliberate breach of the Employment Agreement, during the period of his employment by the Company, Kush:

(a)    worked on the formation of Global Films, a competitive business venture;

(b)    solicited, diverted, interfered with or disrupted the Company's business relationships with its existing and potential customers and business contacts and with its distributors in the United States and China, and/or attempted to do so;

(c)    diverted, or attempted to divert, solicit, recruit, or hire employees of the Company;

(d)    failed and refused to return documents related to the business of the Company at the request of the Company, and willfully and intentionally destroyed and/or attempted to destroy such documents in response to the Company's request for their return; and

(e)    solicited an employment arrangement with Insulectro, the Company's exclusive distributor in the United States.

41.    Kush's breach of the Non-Competition Clause of the Restrictive Covenant has resulted in direct and consequential damages to Plaintiff, including loss of profits and damage to the Company's good will, in an amount to be proven at trial.

## COUNT THREE

### (Breach of Contract: Violation of Best Efforts Clause)

42.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "41", as if fully set forth herein.

43.    Pursuant to the Employment Agreement, Kush was obligated to devote his full time and attention to the Company's business and to use his best efforts to promote the interests and welfare of the Company.

44.    Nevertheless, during the period from at least mid-2006 through his termination, Kush neglected his duties and responsibilities to the Company and, instead, devoted a substantial portion of his working time and effort to the formation of Global Films.

45.    During the relevant period, Kush disparaged the Company and its management by, among other things, representing in the business plan for Global Films that "[t]here may be leadership and senior staff longevity issues" at the Company.

46.    During the relevant period, Kush threatened to harm the Company, by advising Company employees that he intended to "take the Company down."

47.    Kush's conduct was in breach of the Best Efforts Clause of the Employment Agreement [Ex. A §2(3)].

48.    As the result of said breach, Plaintiff has sustained direct and consequential damages, including loss of profits and damage to the Company's good will, in an amount to be proven at trial.

## COUNT FOUR

### (Fraud)

49.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1"

through "48", as if fully set forth herein.

50.     During the period from at least January 2007 through November 2007, Kush on numerous occasions described below, knowingly and with intention to deceive the Company, misrepresented his Business Expenses in the Expense Accounts submitted to James Hart ("Hart"), the Company's Chief Financial Officer by fabricating Business Expenses.

51.     Kush, knowingly and with intention to deceive the Company, misrepresented his Business Expenses in Expense Accounts that he submitted to Hart for the purpose of financing numerous trips to Asia to pursue other competitive business ventures, including the formation of Global Films, and for personal vacations.

52.     Kush, knowingly and with intention to deceive the Company, misrepresented personal expenses unrelated to Company business, including gifts of flowers, perfume and lingerie, as Business Expenses in the Expense Accounts that he submitted to Hart.

53.     On or about January 29, 2007, Kush knowingly and intentionally submitted to Hart an Expense Account, dated January 26, 2007, seeking reimbursement for lodging charges at the Rancho Las Palmas Resort & Spa in Los Angeles, California in the sum of $791.09, purportedly incurred on January 26, 2007, and for airfare from Atlanta, Georgia to Los Angeles in the sum of $1,379.20, purportedly incurred on January 26, 2007, in connection with an annual trade show. Kush knowingly and intentionally misrepresented the dates on which these expenses were incurred in the Expense Account.

54.     Thereafter, by subsequent Expense Account, dated February 23, 2007, Kush knowingly and intentionally submitted to Hart for reimbursement, expenses for the same lodging and airfare charges previously submitted in the January 26, 2007 Expense Account. The February 23, 2007 Expense Account sought reimbursement for lodging at the Rancho Las

Palmas Resort & Spa in Los Angeles, California in the aggregate sum of $791.09, incurred over a three-night period from February 17, 2007 through February 19, 2007, in increments of $263.39, $263.70 and. $263.69, and for airfare from Atlanta, Georgia to Los Angeles in the sum of $1,329.20, on February 22, 2007, which, according the receipts submitted by Kush, represent the dates such expenses were actually incurred.

55.     On or about April 9, 2007, Kush knowingly and intentionally submitted to Hart an Expense Account, dated March 23, 2007, seeking reimbursement for charges for airfare from Atlanta, Georgia to Minneapolis/St. Paul, Minnesota in the sum of $728.80, for travel on April 10, 2007.

56.     Thereafter, on or about April 30, 2007, Kush knowingly and intentionally submitted to Hart an Expense Account, dated April 13, 2007, seeking reimbursement for a second time for the same airfare charges from Atlanta, Georgia to Minneapolis/St. Paul, Minnesota in the sum of $728.80, incurred on April 10, 2007.

57.     On or about May 18, 2007, Kush submitted to Hart an Expense Account, dated May 18, 2007 for airfare charges from Atlanta, Georgia to Manchester, New Hampshire in the sum of $848.30, incurred June 7 and 8, 2007.

58.     Thereafter, on or about June 11, 2007, Kush knowingly and intentionally submitted to Hart an Expense Account, dated June 16, 2007, seeking reimbursement for a second time for the same airfare charges from Atlanta, Georgia to Manchester, New Hampshire in the sum of $848.30, falsely representing that such expense was incurred on June 14, 2007.

59.     On or about September 9, 2007, Kush submitted to Hart an Expense Account, dated November 9, 2007, for airfare charges from Atlanta, Georgia to Munich, Germany in the sum of $2,482.96, for travel on November 12, 2007.  Upon information and belief, the date of

the Expense Account was in error.

60.     Thereafter, on or about October 22, 2007, Kush knowingly and intentionally submitted to Hart an Expense Account, dated October 13, 2007, seeking reimbursement for a second time for the same airfare charges from Atlanta, Georgia to Munich, Germany in the sum of $2,482.96, incurred on November 12, 2007.

61.     Thereafter, on or about November 19, 2007, Kush knowingly and intentionally submitted to Hart an Expense Account, dated November 16, 2007, seeking reimbursement for a third time for the same airfare charges from Atlanta, Georgia to Munich, Germany in the sum of $2,482.96, incurred on November 12, 2007.

62.     In addition to the foregoing, Kush, knowingly and with intention to deceive the Company, directed and caused other Company sales employees to submit Expense Accounts containing fabricated Business Expenses to the Company for Kush's trips to Asia to pursue the formation of Global Films and for personal vacations.

63.     Further, Kush, knowingly and with intention to deceive the Company, directed and caused other Company sales employees to submit Expense Accounts containing fabricated Business Expenses to the Company for his personal expenses unrelated to the Company business, including gifts of flowers, perfume and lingerie.

64.     The submission of Business Expenses by Kush in the Expense Accounts described above was both knowing and intentional and was done by Kush with full knowledge of the falsity of the information contained in the Expense Accounts and/or with reckless disregard for the truth or accuracy of their contents, for the purpose of obtaining reimbursement by the Company for sums to which he was not entitled.

65.     In misrepresenting to the Company the sums due him in the Expense Accounts

described above, Kush knew that the Company would rely upon his representations regarding his Business Expenses.

66.     The Company reasonably relied upon the representations made by Kush regarding the Business Expenses in the Expense Accounts described above and reimbursed Kush for the claimed expenses in reliance thereon.

67.     Kush's fraudulent misrepresentations to the Company were gross, wanton, willful and morally culpable.

68.     As the result of Kush's misrepresentations, the Company has been damaged in an amount to be determined at trial.

## COUNT FIVE

### (Breach of Fiduciary Duty: Formation of Global Films)

69.     Plaintiff repeats the allegations set forth in the paragraphs "1" through "68", as if fully set forth at length herein.

70.     As a key employee of the Company, Kush owed fiduciary duties to the Company which prohibited him from acting in any manner inconsistent with his agency or trust.  Kush was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties and to use his best efforts to promote the Company's products and to act solely in the interests of and for the sole benefit of the Company.

71.     As a key employee of the Company, Kush was required to disclose all pertinent facts to the Company which he knew or should have known would be useful to the Company in the protection and promotion of its interests in connection with his employment.

72.     Nevertheless, during the period from at least mid-2006 through termination, Kush used the Company's time, resources, funds and confidential and proprietary information in an

effort to form Global Films, a directly competitive business, thus diverting and/or attempting to divert valuable business opportunities from the Company.

73.    As part of his efforts to form Global Films, Kush solicited partners, including the Company's distributor in China, to engage in a business venture in direct competition to the Company.

74.    In so doing, Kush directly and indirectly solicited the Company's existing and potential customers, thereby usurping and/or attempting to usurp valuable business opportunities from the Company.

75.    In so doing, Kush directly and indirectly solicited Company personnel to join him in his competitive venture, thereby diverting or attempting to divert Company resources.

76.    In the course of the formation of Global Films, Kush disparaged the Company and its senior management, thereby harming the reputation and good will of the Company, in further violation of his duty of undivided loyalty to the Company.

77.    Kush concealed and failed to disclose the formation of Global Films to the Company in violation of his fiduciary duty to account for and to disclose all pertinent facts to the Company.

78.    Kush neglected his responsibilities to act as a full-time key employee of the Company.

79.    Kush's breach of his fiduciary duties to the Company was gross, wanton, willful and morally culpable.

80.    As a proximate result of Kush's breach of his fiduciary duties, the Company has suffered damages in an amount to be proven at trial, including lost opportunities for profit.

81.    As part of the Company's damages for Kush's breach of fiduciary duty to the

Company, the Company is entitled to reimbursement for all compensation, benefits and expenses paid to Kush during the period of his disloyalty, i.e., from at least mid-2006 through January 2008, in an amount to be proven at trial, but no less than $350,000.

## COUNT SIX

### (Breach of Fiduciary Duty: Solicitation of Insulectro)

82.    Plaintiff repeats the allegations set forth in the paragraphs "1" through "81", as if fully set forth at length herein.

83.    During all relevant periods, Insulectro served as the Company's exclusive distributor for Pacothane Products in the United States.

84.    The coordination of sales of Pacothane Products in the United States through Insulectro was among Kush's primary responsibilities for the Company.

85.    Nevertheless, in or about January 2008, Kush attempted to negotiate a personal employment arrangement with Insulectro.

86.    Kush's conduct violated his fiduciary duty of undivided loyalty to the Company.

87.    Kush concealed his negotiations with Insulectro from the Company in violation of his fiduciary duty to account for and to disclose to the Company all pertinent facts relating to his employment.

88.    Kush's breach of his fiduciary duties to the Company was gross, wanton, willful and morally culpable.

89.    As a proximate result of Kush's breach of his fiduciary duties, the Company has suffered damages in an amount to be proven at trial, including lost opportunities for profit.

90.    As part of the Company's damages for Kush's breach of fiduciary duty to the Company, the Company is entitled to reimbursement for all compensation, benefits and expenses

paid to Kush during the period of his disloyalty, in an amount to be proven at trial, but no less than $350,000.

## COUNT SEVEN

### (Misappropriation of Trade Secrets and Confidential and Proprietary Business Information)

91.     Plaintiff repeats the allegations set forth in the paragraphs "1" through "90", as if fully set forth at length herein.

92.     In the course of his duties for the Company, Kush had access to trade secrets and other confidential information of the Company which was not readily ascertainable to the public, including information regarding the specifications for and the method of manufacturing of its Pacothane Products, the source of suppliers for raw materials, the costs of manufacturing and sales, the names of customers and distributors, detailed information regarding customer contracts, the Company's commission structure and performance data, the advantages and disadvantages of Pacothane Products versus competitive products, and corporate planning details, including the Company's 2008-2009 business plan.

93.     Kush wrongfully used the Company's trade secrets and confidential and proprietary business information obtained in his position for the Company to form Global Films.

94.     Kush's wrongful use of the Company's trade secrets and confidential and proprietary business information resulted in loss of profits to the Company and in damage to the Company's good will.

95.     Kush's calculated misappropriation of the Company's confidential and proprietary business information was gross, wanton, willful and morally culpable.

96.     As a proximate result of Kush's misappropriation of the Company's trade secrets

and confidential and proprietary business information, the Company has been damaged in an amount to be proven at trial.

## COUNT EIGHT

### (Misappropriation of Company Funds and Resources)

97.    Plaintiff repeats the allegations set forth in the paragraphs "1" through "98", as if fully set forth at length herein.

98.    In the course of his duties for the Company, Kush was responsible for the monitoring of expenses of the sales organization, including his own expenses.

99.    Kush wrongfully used his position with the Company to misappropriate financial resources of the Company to assist in the formation of Global Films.

100.    Kush misappropriated Company funds through the intentional submission of false Expense Accounts to the Company during the period from January 2007 through November 2007.

101.    Kush wrongfully used his position with the Company to direct other Company employees to misappropriate financial resources of the Company to assist in the formation of Global Films.

102.    Kush misappropriated Company resources through the solicitation and enlistment of Company employees to assist him in the formation of Global Films.

103.    Kush misappropriated Company funds to finance personal expenses, unrelated to Company business.

104.    Kush wrongfully used his position with the Company to direct other Company employees to misappropriate financial resources of the Company to pay for Kush's personal expenses.

105.    Kush's calculated misappropriation of the Company's funds and resources was gross, wanton, willful and morally culpable.

106.    As the proximate result of Kush's misappropriation of the Company's funds and resources, the Company has been damaged in an amount to be proven at trial.

## COUNT NINE

### (Accounting in Law and Equity)

107.    Plaintiff repeats the allegations set forth in paragraphs "1" through "106" as if fully set forth at length herein.

108.    Pursuant to the Employment Agreement, Plaintiff is entitled to an accounting for damages or any other relief to which the Company may be entitled for Kush's breach of his obligations pursuant to the Restrictive Covenant contained in Paragraph 8 of the Employment Agreement.

109.    Accordingly, Kush is obliged to account for any sales or other lost opportunities which the Plaintiff could reasonably have expected to have had, but for Kush's breach of the Restrictive Covenant.

110.    As a fiduciary of the Company, Kush had an equitable duty to account to the Company.

111.    Accordingly, Kush is obliged to account for any sales or other lost opportunities which the Plaintiff could reasonably have expected to have had, but for Kush's breach of his fiduciary duties, and for any compensation, commissions, expenses, benefits, or other sums received by Kush from the Company or otherwise relating to his position with the Company during the period of his disloyalty to the Company and to forfeit same to the Company as damages.

112.    Kush is further obliged to account to the Company for any sums expended by him or on his behalf in connection with the breach of his duty and the sources of such funds, and to account for any assets, inventory, documents or other property of the Company which are in his possession or control.

WHEREFORE, Plaintiff demands judgment against Kush as follows:

(a)    On the First through Third Counts, granting direct and consequential damages, including damages for the loss of profits and damage to the Company's good will, in an amount to be proven at trial;

(b)    On the Fourth Count, granting consequential and punitive damages in an amount to be proven at trial;

(c)    On the Fifth and Sixth Counts, granting compensatory damages, disgorgement of any compensation, commissions, benefits or expenses received by Kush from the Company in an amount to be proven at trial, but no less than $350,000, and punitive damages;

(d)    On the Seventh and Eighth Counts, granting compensatory damages, including damages for loss of profits and damage to the Company's good will, and punitive damages, in an amount to be proven at trial;

(e)    On the Ninth Count, granting an accounting: for sales and other lost opportunities which the Plaintiff could reasonably have expected to have had, but for Kush's breach of his fiduciary duties; for any compensation, commissions, benefits, expenses, or other sums received by Kush from the Company or otherwise relating to his position with the Company during the period of his disloyalty to the Company;  any sums expended by Kush in connection with the breach of his

duties to the Company and the sources of such funds; and, for any assets, inventory, documents or other property of the Company which are in Kush's possession or control; and

(f)    granting such other and further relief as the Court may deem just and proper, including the costs and disbursements of this action.

Dated: White Plains, New York
February 26, 2008

Yours, etc.,

KURZMAN EISENBERG CORBIN &
LEVER, LLP

By:

Judith Zerden (JZ- 4573)
Attorneys for Plaintiff
One North Broadway
White Plains, New York 10601
(914) 285-9800

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("**Agreement**") made as of this _14th_ day of _December_, 2005 between **MULTILAYER WORLDWIDE ENTERPRISES, LLC.**, a New York limited liability company, with offices at 1556 Third Avenue, Suite 402, New York, New York 10128 (the "**C o m p a n y**"), and **D A N I E L    K U S H** residing at _4480-H, Soith Cobb Dr_ (the "**Executive**").

_# 440_
_Smyrna, GA 30080_    **WITNESSETH,**

**THAT, WHEREAS,**

A.  The Company is engaged in the distribution and sale of products in the printed circuit board industry;

B.  The Executive has heretofore been employed by the Company for a number of years as its Director of Sales & Marketing;

C.  The Company wishes to continue to employ Executive in such capacity; and

D.  The Company and Executive desire to enter into this agreement to set forth the terms and conditions of such continued employment;

**NOW, THEREFORE,** in consideration of the premises and of the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.  **TERM OF EMPLOYMENT.**

    (a) **Term**. The Company agrees to employ Executive during the period commencing on January 1, 2005 and ending on December 31, 2009 (the "**Initial Term**") as its Director of Sales & Marketing and Executive agrees to be employed by the Company in such capacity, subject to the termination provisions set forth hereinafter.

    (b) Extension of Term. The Initial Term of this Agreement shall be extended after December 31, 2009, for additional successive one year periods (the "Additional Term") (the Initial Term and any Additional Term are hereinafter referred to as the "Term"), unless the Company gives Executive not less than ninety (90) days prior notice of non-renewal at the end of each Additional Term.

2.  **POSITION AND DUTIES.**

    (a) **Duties**.    The Company hereby employs Executive, and Executive accepts such employment, to serve as Director of Sales & Marketing of the Company during the Term, and, in such capacity, to perform any and all duties consistent with Executive's position, to the best of

Executive's abilities. The Company shall have the power to determine the specific duties to be performed by Executive, and the means and the manner by which those duties shall be performed. The Company's Chairman ("**Chairman**"), shall have the power to supervise the duties to be performed, the manner of performing such duties, and the terms for performance thereof. Executive's job description is subject to modification in the sole discretion of the Chairman at any time.

(b) **Other Services**. During the Period of Employment, Executive shall perform such other reasonable services for the Company as shall be prescribed from time to time by the Chairman; except as provided in Paragraph 4, no additional compensation shall be payable to the Executive for any services performed by him as an officer, director or in any other capacity for the Company. As used in this Agreement, the term "**Company**" shall include the subsidiaries of the Company.

(c) **Best Efforts**. During the Term, Executive agrees to devote his full business time, attention and best efforts to the faithful discharge of the duties described herein and to use his best efforts to promote the interests and welfare of the Company. During the Term, Executive shall not engage in any other business activity (except on behalf of affiliates of the Company), regardless of whether or not it is pursued for gain or profit. The parties hereto understand and agree that Executive may participate in charitable and similar activities which may, from time to time, require portions of his time, but which Executive agrees shall not interfere with the performance of his duties hereunder, and shall not adversely reflect upon the Company or its operations. The Company agrees that Executive shall not be in violation of this provision as a result of his ownership of not more than 2% of the issued and outstanding stock of any publicly traded company.

3.    **BASE SALARY**.
(a) **Base Salary**. For services hereunder, the Company shall pay Executive a base salary ("**Base Salary**") for each calendar year during the Term of $150,000. For each Additional Term hereunder the then current Base Salary shall be increased five percent (5%) per annum.

(b) The Base Salary shall be payable to Executive in regular intervals in accordance with the Company's usual payroll practices. All compensation shall be subject to such withholding of any federal, state or local taxes as may be required by law with respect to such payments.

4.    **BONUS COMPENSATION**.
(a) <u>Non-Discretionary Bonus</u>. Executive shall also be entitled to receive an annual non-discretionary bonus (the "Bonus"), payable for each full calendar year that Executive is employed hereunder. The Bonus shall be based on the aggregate Gross Margin (as hereinafter defined) of sales of Pacothane Products by the Company to the extent that Gross Margin on Pacothane Products is in excess of $3,700,000 in any calendar year. Executive shall be entitled to increases in the Bonus payable in the amount of $7,500 for each $100,000 incremental increase in Gross Margin, in accordance with the calculations set forth on <u>Schedule "A"</u> hereto.

(b) **Gross Margin**.  "Gross Margin" as used herein, shall mean the gross margin on sales of the Company, as shown on the financial statements prepared by the Company's certified public accountants.

(c) **Payment of Bonus.**  The Bonus shall be payable no later than March 15th following the end of the calendar year to which such Bonus relates.  The calculation of the Bonus shall be made by the Company's then certified public accountants and their decision shall be final and binding on Executive.

5.    **FRINGE BENEFITS.**

As additional consideration for the services of Executive under this Agreement, the Company shall provide to Executive all fringe benefits provided by the Company to other management personnel at a comparable level, including the following:

(a) **Car Allowance**.  Executive shall receive a car allowance in an amount not to exceed $650.00 per month (which amount may be adjusted upward by mutual agreement of the parties), payable monthly, for costs incurred in connection with the operation of Executive's car for the business of the Company.

(b) **Vacation and Sick Leave**.  Executive shall be entitled to paid vacation, holiday and sick leave, in the same manner and to the same extent as such vacation, holiday and sick leave time shall be available to other management personnel at a comparable level.

(c) **Group Insurance**.  The same coverage of group health, group life insurance and short and long term disability that the Company may maintain in effect from time to time for the benefit of other management personnel at a comparable level; provided, that the Company reserves the right to amend, modify and/or cease maintaining any or all such insurance plans that are in effect at any time during the Term, and to require that employees pay all or a portion of the costs of such policies.

(d) **Deferred Compensation Plans**.  Participation in any retirement plan, 401(k) plan, profit sharing and/or pension plan that may be enacted by the Company, in the same manner and to the same extent as such plan participation is available to the Company's other management personnel at a comparable level, and subject to the provisions and requirements of such plans.

Notwithstanding the foregoing, the Company reserves the right to amend, modify and/or cease maintaining any or all such retirement, 401(k), profit-sharing and/or pension plans that are in effect at any time during the Term, and to require that employees pay all or a portion of the costs of such plans, so long as Executive is treated similarly to other management personnel at a comparable level.

6.     **BUSINESS EXPENSES.**

Executive may incur, for the benefit of the Company and in furtherance of the Company's business, various reasonable expenses in accordance with the budget and policies of the Company, as determined by its Board from time to time, for the purpose of promoting the business of the Company. In furtherance of the foregoing, and not in limitation thereof, the Company agrees, upon presentation by Executive from time to time of itemized accountings therefor, to pay or to reimburse Executive for, all reasonably necessary expenses of travel and entertainment undertaken by Executive for the benefit of the Company. Executive shall support any claim for reimbursement for expenses by adequate proof of such expenditures in the form of cancelled checks, vouchers, bills or in other form satisfactory to the Company.

7.     **TERMINATION.**

(a) **Termination for Cause.**  The Company may terminate this Agreement, and (except as provided below) all of the Company's obligations hereunder, for **"cause"** (as hereinafter defined). Such termination shall be effected by notice thereof delivered by the Company to Executive, and shall be effective as of the date of such notice. In the event of termination for cause, Executive shall be entitled to receive all Base Salary earned to the date of termination, but all other rights of Executive hereunder shall terminate as of the effective date of Executive's termination. As used herein, **"cause"** shall mean: (i) Executive's conviction of a felony which involves moral turpitude; or (ii) Executive's repeated failure to discharge his assignments from the chairman or the Board (as appropriate) consistent with the responsibilities of his position and the failure by Executive to correct such failure within 30 days after written notice thereof from the Company; (iii) the commission by Executive of any crime or intentional act of fraud against the Company; (iv) any conduct on the part of Executive which has a material adverse effect upon the performance by Executive of his duties hereunder or upon the relationship of customers or employees of the Company with the Company or (v) Executive's gross negligence or willful misconduct in the performance of his duties which has a material adverse effect on the Company's operations, profits or business.

(b) **Termination Without Cause**.  The Company may terminate this Agreement and (except as provided below) all of the Company's obligations hereunder without cause by giving Executive 30 days prior written notice thereof. In the event of termination without cause, Executive shall be entitled to receive all Base Salary earned but unpaid to the date of termination and, subject to the execution and effectiveness of the Company's standard severance agreement and release, Executive shall be entitled to severance (**"Severance"**) equal to the greater of (x) two years Base Salary or (y) Base Salary payable through the end of the then current Term. All other rights of Executive hereunder shall terminate as of the effective date of Executive's termination. Severance payable hereunder shall be payable in normal payroll installments during the Severance period.

(c) **Resignation of Executive.**  If Executive resigns, Executive shall be entitled to receive all Base Salary earned to the effective date of resignation, which shall be payable upon such resignation.

but all other rights of Employee hereunder shall terminate as of the effective date of Executive's resignation.

(d) **Executive's Total Disability.** If Executive is terminated by the Company, or Executive resigns, due to Executive's "**total disability**" (as hereinafter defined), Executive shall be entitled to receive all Base Salary earned to the date of termination, which shall be payable upon such termination or resignation. All other rights of Executive hereunder shall terminate as of the date of Executive's termination or resignation. As used herein, "**total disability**" shall mean any physical or mental ailment which prevents Executive from performing the duties incident to Executive's employment with the Company which has continued for a period of ninety (90) consecutive days and which is expected, based upon the results of an examination by a physician mutually acceptable to Executive and the Company, to be of permanent duration.

(e) **Death.** If Executive dies during the Term, Executive's estate shall be entitled to receive all Base Salary earned to the date of death, which shall be payable upon the date of death. All other rights of Executive hereunder shall terminate.

8.    **RESTRICTIVE COVENANT.**

In consideration of Executive's special and unique services and Executive's position, which by its nature exposes Executive to trade secrets, proprietary information and other confidential material and assets of the Company, Executive covenants and agrees as follows with the Company:

(a) For the purposes of this Agreement, the term "**Confidential Information**" shall mean any data, proprietary information, financial information, trade secrets, and other materials and information, including, without limitation, contracts, customer lists, supplier lists, names of representatives of customers and suppliers, Company information as to specific customer needs, requirements, purchasing history, pricing information, information relating to costs, marketing, selling, servicing, technology, know-how, plans, processes, techniques, inventions, discoveries, formulae, designs, patterns or devices in any way concerning the operation of the Company's business. The term Confidential Information does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure directly or indirectly by Executive), or (ii) has been independently acquired or developed by a third party not obligated to keep such information confidential.

(b) Executive hereby agrees that during the term of Executive's employment by the Company and at all times thereafter that he: (i) will keep confidential and protect all Confidential Information (as hereinabove defined) known to him or in his possession, (ii) will not disclose any Confidential Information to any person or entity, except as may be required in the performance by of his duties as an employee of the Company, (iii) will not use any Confidential Information except for the exclusive benefit of the Company and (iv) will return any Confidential Information and/or

documents containing Confidential Information at the end of the term or at any time at the Company's request.

(c)  During the Covenant Period (as hereinafter defined) Executive shall not:

(i)    directly or indirectly (whether as owner, principal, agent, partner, officer, employee, independent contractor, consultant, stockholder, or otherwise), engage or participate or have any financial interest in or perform services for, any entity which offers any service in competition with the Company or engage in any business or activity which is substantially the same as any business or activity related to the business which the Company or any of its affiliates is now or may hereafter become engaged in any location where such activity would be in competition with the business of the Company as conducted at the time of termination of Executive's employment with the Company.  Executive acknowledges that the Company now carries on its business in many trading areas throughout the world and in particular in the United States.

(ii)   for himself or with or as an agent for any other person, firm, corporation or entity, directly or indirectly, solicit, interfere with, endeavor to entice away from, divert or attempt to divert or otherwise interfere with, or disrupt the business relationship of the Company with, (i) any person or entity who is a client, customer or business contact of the Company during the Covenant Period, or (ii) any potential clients, customers or business contacts with whom the Company is actively negotiating at the time of termination of Executive's employment with the Company.

(iii)  directly or indirectly, for his own benefit or for the benefit of any other person, firm, corporation or entity, divert, or attempt to divert, solicit, recruit, entice or hire away any employees of the Company, whether or not any such employee is a full-time, part-time or temporary employee and whether or not such person's employment is for a determined period or at will, unless such person shall have ceased to be an employee of the Company for a period of at least 12 months.

(d)  As used in this Agreement, the term "**Covenant Period**" shall mean the period commencing on the date of this Agreement and ending two (2) years following the effective date of termination.

(e)  During the Term, Executive will promptly disclose to the Company, and the Company will own all right, title and interest in, all inventions, and other intellectual property (the "**Intellectual Property**") which Executive conceives or develops during the course of Executive's

employment (excluding that which Executive conceives or develops without the use of the Company's time, resources or facilities and which does not relate to the Company's past, present or planned future activities), will affix appropriate legends and copyright notices indicating the Company's ownership of all Intellectual Property and all underlying documentation, and will execute such further assignments and other documents as the Company consider necessary to vest, perfect, maintain or defend the Company's right, title and interest in the Intellectual Property.

(f) Executive will deliver promptly to the Company on termination of Executive's employment by the Company, or at any other time the Company may so request, all memoranda, notes, records, reports and other documents (and all copies thereof) relating to the business of the Company which he obtained while employed by, or otherwise serving or acting on behalf of, the Company and which he may then possess or have under his control or relating to the Intellectual Property.

(g) In addition to a right to accounting by the Company and/or damages and/or any other relief to which the Company may be entitled as a result of Executive's breach of the provisions of this Paragraph 9, the Company will be entitled to injunctive relief restraining any such breach or threatened breach, or the continuation of such breach, by Executive, provided, however that, if a court of competent jurisdiction shall determine that this covenant shall be enforceable only if limited to a shorter period of time or to a smaller geographical area than is herein expressly provided, or otherwise limited, then and in such event, this covenant shall be deemed to be limited to the extent so determined to be enforceable, in the same manner and to the same extent as if such limits were expressly provided herein.

(h) The Company may assign its rights and remedies against Executive to any person or entity, and such rights and remedies may be enforced by any successors or assigns of the Company.

(i) Executive shall not be required to mitigate the Company's damages by obtaining a new job, if however, Executive obtains a new job during the period in which severance is being paid, Executive shall promptly notify the Company and the Company shall have no further obligation to pay Executive severance.

9.    **COMPANY'S REPRESENTATIONS.**
The Company hereby represents and warrants to Executive that: (a) it has full power and corporate authority to execute and deliver this Agreement and to perform its obligations hereunder, (b) such execution, delivery and performance will not (with the giving of notice or the lapse of time or both) result in the breach of any agreements or other obligations to which it is a party or is otherwise bound, (c) the execution and delivery of this Agreement by the Company is not in violation of the Company's certificate of incorporation or by-laws, and (d) this Agreement is the legal, valid and binding obligation of the Company which is enforceable against the Company in accordance with its terms.

10.  **REPRESENTATIONS BY EXECUTIVE.**

(a)  Executive warrants and represents to the Company that, to the best of Executive's knowledge, each of the following is true, correct and complete on the date of this Agreement:

(i)  The execution, delivery and performance of this Agreement by Executive, and the consummation of the transactions contemplated hereunder, do not and will not conflict with, violate or result in the breach of any of the terms or conditions of, or constitute a default under, (1) any contract, agreement, commitment or other instrument or obligation to which Executive is a party, or (2) any common law duty that may be owed by Executive to any former employer or other person or entity or to any of their respective current or former affiliates, shareholders, officers, or directors, or (3) any law, regulation, ordinance or decree to which Executive is subject.

(ii)  Executive has the power, authority and capacity to enter into this Agreement and to perform all of his obligations hereunder.

(iii)  No permit, consent, approval, or authorization of, or designation, declaration or filing with, any person or entity is required by Executive in connection with the execution or delivery by her of this Agreement or the consummation of the transactions contemplated hereunder.

(b)  Executive shall indemnify the Company, and each of the Company's shareholders, officers, directors, employees and agents, from and against any and all claims, demands, damages, fines, penalties, losses, liabilities, interests, costs and expenses (including, without limitation, reasonable attorney fees and expenses, and expert fees and expenses) arising from or related to any breach by Employee of any of the representations or warranties made by Executive.

11.  **SCOPE OF RESTRICTIONS.**

If any severable provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein; provided, however, that if any of the restrictions contained in Paragraph 9 hereof shall be deemed to be unenforceable by reason of the extent, duration or geographical scope thereof, or otherwise, then such restriction shall be deemed reduced to such extent, duration, geographical scope or in such other manner as otherwise required to make it enforceable, and, in such reduced form, Paragraph 9 hereof shall then be enforceable in the manner contemplated hereby.

12.    **NOTICES.**

Any notice hereunder shall be sufficient if sent either (a) by hand, or (b) by certified mail, return receipt requested, or (c) by commercial overnight delivery service, in any event with postage, fees and delivery charges prepaid. Such notice shall be deemed to have been given on receipt, if delivered by hand or by overnight carrier, or three business days after the date of deposit in an official depository of the United States mail, if mailed. All notices shall be mailed or delivered, as aforesaid, addressed to the party to be notified at such party's address set forth below or at such other address as the party to be notified may have otherwise designated, by notice in writing, with copies to their respective attorneys as set forth below:

If to the Company:    Multilayer Worldwide Enterprises, LLC
1556 Third Avenue, Suite 402
New York, New York  10128
Attention:  Martin J. Wilheim, Chairman
Telephone:  (212) 348-2300
Facsimile:  (212)348-2178

with a copy to:    KURZMAN EISENBERG CORBIN
LEVER & GOODMAN, LLP
One North Broadway, 10th Floor
White Plains, New York 10601
Attention:  Joel S. Lever, Esq.
Telephone:  (914) 285-9800
Facsimile:  (914) 285-9855

If to Executive, to:    DANIEL KUSH
4480-14 South Cobb Dr # 440
Smyrna, GA 30080

13.    **MISCELLANEOUS.**

(a)  The parties severally acknowledge that they have not relied upon any representations, warranties, negotiations, understandings, arrangements, or other inducements not expressly set forth herein in entering into this Agreement.

(b)  This Agreement may not be modified except by written modification signed by all parties hereto, and its terms and conditions may not be deemed waived except by written waiver signed by the party to be charged with such waiver.

(c) This Agreement contains the entire agreement and understanding by and between the Company and Executive with respect to Executive's employment by the Company, and supersedes all oral and written prior understandings and agreements between the Company and Executive relating to the subject matter of this Agreement and Executive's relationship to the Company.

(d) This Agreement may be executed in counterparts, each of which will be deemed an original of this Agreement but all of which together will constitute one Agreement.

(e) This Agreement has been made in, and its validity and interpretation will be determined under the internal laws of, the State of New York applicable to contracts made and to be wholly performed therein. Any suit, action or other proceeding in connection with this Agreement shall be brought by any party hereto in a court of record in the State of New York, County of New York or in the United States District Court for the Southern District of New York, each of the parties hereto consenting to the jurisdiction of such courts for such purpose.

(f) This Agreement is binding upon and inures to the benefit of the parties and their personal representatives, successors and assigns.

(g) The paragraph headings used in this Agreement are included solely for convenience and shall not affect or be used in connection with the interpretation of this Agreement. Schedules annexed hereto are a part of this Agreement as if set forth herein at length.

(h) The rights and benefits of Executive under this Agreement are personal to Executive and no such right or benefit shall be subject to voluntary or involuntary alienation, assignment or transfer. The Company may not assign its rights under this Agreement to any other person or entity other than a wholly owned subsidiary or a corporation into which the Company may merge or to which the Company may sell all or substantially all of its assets.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

COMPANY:          **MULTILAYER WORLDWIDE ENTERPRISES, LLC**

By: _____

Name: Martin J. Wilheim

Title:   Chairman

EXECUTIVE: _____ 12/14/05

**DANIEL KUSH**

## SCHEDULE A

### BONUS CALCULATION
### FOR
### SALES OF PACOTHANE PRODUCTS
### BASED ON GROSS MARGIN

For each increase of $100,000 in Gross Margin generated from sales of Pacothane Products, Executive shall be entitled to an increase of $7,500.00 in Bonus, calculated as follows:

| Calendar Year Gross Margin | Bonus Payable |
|---|---|
| $3,700,000.00 | -0- |
| 3,800,000.00 | 7,500.00 |
| 3,900,000.00 | 15,000.00 |
| 4,000,000.00 | 22,500.00 |
| 4,100,000.00 | 30,000.00 |
| 4,200,000.00 | 37,500.00 |
| 4,300,000.00 | 45,000.00 |
| 4,400,000.00 | 52,500.00 |
| 4,500,000.00 | 60,000.00 |
| 4,600,000.00 | 67,500.00 |
| 4,700,000.00 | 75,000.00 |
| 4,800,000.00 | 82,500.00 |
| 4,900,000.00 | 90,000.00 |
| 5,000,000.00 | 97,500.00 |